UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------X
                           :

LAURIE SCOTT, individually and on behalf of  :
all others similarly situated,
                           :

               Plaintiff,    :

                           :

               v.         :

                           :

JPMORGAN CHASE & CO., JPMORGAN  :
CHASE BANK, N.A., and CHASE BANK, USA,  :
N.A.,
                           :

             Defendants.  :

                           :
-------------------------------------------------------X

| USDC SDNY |
| :--- |
| DOCUMENT |
| ELECTRONICALLY FILED |
| DOC #: _____ |
| DATE FILED: __01/30/2014__ |

13 Civ. 646 (KPF)

OPINION AND ORDER

KATHERINE POLK FAILLA, District Judge:

      On January 29, 2013, Plaintiff Laurie Scott ("Plaintiff" or "Scott") filed a

class action against JPMorgan Chase & Co. ("JPMC"), JPMorgan Chase Bank,

N.A. ("JPMCB"), and Chase Bank, USA, N.A. ("CBUSA") (collectively,

"Defendants"), alleging that Defendants breached certain agreements with

Plaintiff and other customers by unilaterally enrolling these customers in an

overdraft protection service, and by assessing unauthorized and

unconscionable fees and charges in connection with this overdraft protection

service.  Defendants have moved to stay this litigation in favor of arbitration.

For the reasons set forth in the remainder of this Opinion, Defendants' motion

is granted, and Plaintiff's complaint is dismissed.

## BACKGROUND[1]

### A.    The Defendants and the Relevant Products and Services

JPMC is a bank holding company.  (FAC ¶ 10).  CBUSA is a federally chartered bank, and a subsidiary of JPMC that specializes in credit card services.  (*Id.* at ¶ 12).  Similarly, JPMCB is a federally chartered bank, and a subsidiary of JPMC, but one that specializes in retail banking.  (*Id.*).  One of the products that JPMCB offers to customers is a deposit account that is governed by a Deposit Account Agreement, a copy of which is sent to every customer who opens a deposit account.  (Goforth Decl. ¶ 2 and Exh. B).[2]

There are two components of the Deposit Account Agreement that are relevant to the pending motion.  First, the Deposit Account Agreement offers an overdraft protection service to customers (the "Overdraft Protection Program"), pursuant to which funds would be automatically transferred to a customer's deposit account if the customer overdrew the account.  (Goforth Decl., Exh. B

---

[1]    The facts contained in this Opinion are drawn from Plaintiff's First Amended Complaint ("FAC") (Dkt. #14); the Declaration of Shayla Goforth in Support of Defendants' Motion to Stay Proceedings ("Goforth Decl.") (Dkt. #32); the Declaration of Matthew P. Previn in Support of Defendants' Motion to Stay Proceedings ("Previn Decl.") (Dkt. #33); the Declaration of Joseph I. Marchese in Support of Plaintiff's Opposition to Defendants' Motion to Stay Proceedings in Favor of Arbitration ("Marchese Decl.") (Dkt. #36); the Declaration of Laurie Scott in Support of Plaintiff's Opposition to Defendants' Motion to Stay Proceedings in Favor of Arbitration ("Scott Decl.") (Dkt. #37); and all of the exhibits thereto.

In this Opinion, Defendants' Memorandum of Law in Support of Defendants' Motion to Stay Proceedings in Favor of Arbitration is referred to as "Def. Br."; Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Stay Proceedings in Favor of Arbitration is referred to as "Pl. Opp."; and Defendants' Reply in Support of Defendants' Motion to Stay Proceedings in Favor of Arbitration is referred to as "Def. Reply."

[2]    Deposit account is synonymous with checking account, and the terms are used interchangeably herein.

at 12).[3]  In accordance with the terms of the Overdraft Protection Program, the customer is required to "specify one or more checking accounts [the customer] want[s] protected by the [Overdraft Protection Program], and a single account with [JPMCB] or [its] affiliate for each checking account where the money will come from for Overdraft Protection." (*Id.*).  The Deposit Account Agreement further explains that the account where the money will come from is "called a 'funding account.'  It may be a savings account (including a money market account), a credit card account in good standing, or another qualifying line of credit." (*Id.*).  In practice, if a customer "overdraw[s] an account that has Overdraft Protection, [JPMCB] will automatically transfer available funds from the funding account [that the customer chooses] to the checking account in increments of $50.00 that are enough to pay the overdraft amount and all transfer fees" (the "ODP Transfer").  (*Id.*).  Additional fees are levied against the customer for this service, including a $10 transfer fee (the "Transfer Fee") for each day a transfer from a funding account to a checking account is completed, and, according to Plaintiff, a monthly overdraft interest charge (the "Overdraft Interest Charge") against the funding account (except savings accounts) every month pursuant to the client's funding account agreement. *Id.*; *see also* FAC ¶ 2).

---

[3]     The Deposit Account Agreement defines "Overdraft" or "overdrawing" an account to mean "that your account balance, minus any deposits you've made that are not yet available, and minus holds on your account, is less than $0 or that your available balance is not enough to pay all the items that have been presented to us on a business day."  (Goforth Decl., Exh. B at 5).

Second, the Deposit Account Agreement includes an arbitration clause and class action waiver (the "Arbitration Agreement") that provides, in relevant part:

> [The customer] and [JPMCB] agree that upon the election of either of us, any dispute relating in any way to your account or transactions will be resolved by binding arbitration ... and not through litigation in any court (except for matters in small claims court). This arbitration agreement is entered into pursuant to the Federal Arbitration Act, 9 U.S.C §§ 1-16.
>
> [The customer has the] right to opt out of this agreement to arbitrate ... unless [the customer] opt[s] out of arbitration, [the customer] and [JPMCB] are waiving the right to have [their] dispute heard before a judge or jury, or otherwise to be decided by a court or government tribunal. [The customer] and [JPMCB] also waive any ability to assert or participate on a class or representative basis in court or in arbitration.
>
> All disputes, except as stated below, must be resolved by binding arbitration when either [the customer] or [JPMCB] request it.
>
> Claims or disputes between [the customer] and [JPMCB] about [the customer's] deposit account, transactions involving [the customer's] deposit account, safe deposit box, and any related service with [JPMCB] are subject to arbitration. Any claims or disputes arising from or relating to this agreement, any prior account agreement between [the customer and JPMCB], or the advertising, the application for, or the approval or establishment of [the customer's] account are also included. ... The only exception to arbitration ... is that both [the customer] and [JPMCB] have the right to pursue a Claim in a small claims court instead of arbitration, if the Claim is in that court's jurisdiction and proceeds on an individual basis.

(Goforth Decl., Exh. B at 24). The Arbitration Agreement also extends to claims with JPMCB affiliates and third parties. It states:

> Arbitration applies whenever there is a Claim between [the customer] and [JPMCB]. If a third party is also involved in a Claim between [the customer] and [JPMCB], then the Claim will be decided with respect to the third party in arbitration as well, and it must be named as a party in accordance with the rules of

procedure governing the arbitration. ... For purposes of arbitration, "[the customer]" includes any person who is listed on [the customer's] account, and "[JPMCB]" includes JPMorgan Chase Bank, N.A., all its affiliates, and all third parties who are regarded as agents or representatives of [JPMCB] in connection with a Claim.

(*Id.* at 25).

CBUSA also offers a consumer credit card service that is subject to a separate Cardholder Agreement.  (*See* FAC ¶ 37).[4]

## B.    Plaintiff's Accounts with Defendants

Plaintiff has two accounts with Defendants that are pertinent to the pending motion: a personal checking account with JPMCB opened in October 2009 (the "Checking Account") that is governed by the Deposit Account Agreement; and a consumer credit card account with CBUSA (the "Credit Card Account") that is governed by the Cardholder Agreement.  (*See* FAC ¶¶ 53-55).[5]

When Plaintiff opened the Checking Account, she was provided with the Deposit Account Agreement, which recited that the parties' agreement was subject to "federal law and, when not superseded by federal law," California state law.  (Goforth Decl. ¶ 2 and Exh. B at 22).  Also in connection with the Checking Account, and of particular importance here, Plaintiff was enrolled in the Overdraft Protection Program; Plaintiff alleges that her enrollment was

---

[4]    The parties did not provide a copy of the Cardholder Agreement or submit any other document setting forth its terms and conditions.  This is particularly curious in light of Plaintiff's reliance on the Cardholder Agreement in opposing Defendants' motion.

[5]    The Deposit Account Agreement, effective February 1, 2012 (Goforth Decl., Exh. B), governs Plaintiff's Checking Account and, consequently, the instant dispute, because Plaintiff maintained her Checking Account after the 2012 Deposit Account Agreement became effective.  (Goforth Decl. ¶ 5 and Exh. A at 31 ("By maintaining your [Checking] Account after the effective date of any change, you agree to be bound by the changes.")).  Indeed, Plaintiff's Checking Account remained open as of the date the pending motion was filed.  (Goforth Decl. ¶ 5).

unilateral, and without her knowledge or consent.  (FAC ¶ 54).  Plaintiff's

Credit Card Account was designated as the funding account for the Overdraft

Protection Service — also, it is alleged, without Plaintiff's knowledge or consent.

 (*Id.*).  In addition to the terms identified above, the Deposit Account Agreement

included a provision that allowed for Plaintiff to opt out of the Arbitration

Agreement within 60 days of the effective date of that agreement.  (*See* Goforth

Decl., Exh. B at 24).  JPMCB's records indicate that Plaintiff did not opt out of

the Arbitration Agreement.  (Goforth Decl. ¶ 4).

## C.    Plaintiff's Allegations Against Defendants

Plaintiff's claims principally stem from two withdrawals in her Checking

Account.  The first occurred on February 3, 2010, when Plaintiff withdrew

$213.65 from her Checking Account.  (FAC ¶ 56).  At that time, Plaintiff's

balance in her Checking Account was only $118.50.  (*Id.*).  Consequently,

Plaintiff did not have sufficient funds to cover her withdrawal, and her

withdrawal resulted in a $95.15 overdraft, thereby triggering the Overdraft

Protection Program.  (*Id.*).  Plaintiff then incurred a $10.00 Transfer Fee, a

$150.00 ODP Transfer Charge on Plaintiff's Credit Card Account, and a

monthly recurring Overdraft Interest Charge, amounting to $4.35 in February

2010.  (*Id.*).

The second withdrawal occurred on September 15, 2010.  (FAC ¶ 57).

 On that date, Plaintiff made a withdrawal from her Checking Account of

$1,937.00 when the balance in that account was only $1,936.74.  (*Id.*).  The

withdrawal of funds exceeding the available balance resulted in a $0.26

overdraft that caused a $50.00 ODP Transfer Charge on Plaintiff's Credit Card Account and monthly recurring Overdraft Interest Charges by CBUSA.  (*Id.*).

After these two withdrawals and their attendant charges, Plaintiff filed this class action lawsuit against Defendants for unilaterally enrolling Plaintiff and other customers into the Overdraft Protection Program, and for assessing unauthorized and unconscionable fees and charges on customers in connection with the Overdraft Protection Program, ostensibly in breach of the "Deposit Account Agreement and funding account agreements."  (FAC ¶ 1).  By this lawsuit, Plaintiff seeks to represent a class of persons in the United States who incurred charges associated with the Overdraft Protection Program and for whom Defendants lack verification that those persons authorized their enrollment in that program.  (*Id.* at ¶ 60).  Plaintiff's suit is also on behalf of a subclass of all class members who were charged fees associated with the Overdraft Protection Program in California.  (*Id.* at ¶ 61).

Plaintiff brings claims for breach of contract, breach of the implied covenant of good faith, conversion, unjust enrichment, negligent misrepresentation, fraud, violations of the Electronic Funds Transfer Act and Regulation E, 15 U.S.C. § 1693 ("EFTA"), and the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c), and violations of several California statutes, including the Consumers Legal Remedies Act ("CLRA"), Calif. Civil Code §§ 1750, *et seq.*, the Unfair Competition Law, Calif. Bus. & Prof. Code §§ 17200, *et seq.*, and the False Advertising Law ("FAL"), Calif. Bus. & Prof. Code §§ 17500, *et seq.*  (FAC ¶¶ 67-160).  Each of Plaintiff's

claims is predicated on Defendants' allegedly illegal conduct related to the
Overdraft Protection Program and the charges that customers incurred as a
result of being enrolled in that program.  (*Id.*).

**D.      The Ross Settlement**

Separately pending in this District before the Honorable William H.
Pauley is the case of *Ross, et al.* v. *Bank of America, N.A. (USA), et al.*, No. 05
Civ. 7116 (S.D.N.Y. Aug. 11, 2005).  In *Ross*, plaintiffs filed a class action on
behalf of customers who held general purpose credit or charge cards issued by
JPMC (including CBUSA), among other financial services entities; that lawsuit
challenged the inclusion of arbitration clauses in the agreements between the
entities and the customers governing the general purpose credit and charge
cards, including the Cardholder Agreement.  (Previn Decl., Exh. D, ¶ 1).  As
relevant to the instant dispute, Plaintiff alleges that she is a member of the
*Ross* class, defined as "[a]ll Persons holding during the Period in Suit a Credit
Card under a United States Cardholder Agreement with any of the Bank
Defendants, including JPMC and CBUSA."  (FAC ¶ 48).

The parties in the instant matter do not dispute that JPMC and CBUSA
entered into a settlement agreement with the plaintiffs in *Ross* (the "Ross
Settlement Agreement"), under which JPMC and CBUSA agreed, among other
things, to "remove any and all Arbitration Clauses and the Class Action Waiver
Clauses from its United States Cardholder Agreements," and to "not seek to
enforce an Arbitration Clause or Class Action Waiver Clause against a member
of the Settlement Class based on currently existing or pre-existing United

States Cardholder Agreements." (Previn Decl., Exh. A at 10).  In this regard,

the Ross Settlement Agreement defined "Arbitration Clause" as:

> [T]he terms and conditions contained in any document purportedly binding cardholders — including but not limited to correspondence, change-in-terms notices, cardholder agreements, initial disclosures, solicitations or billing statements — that, at the election of one party, requires the use of arbitration or other binding, out-of-court procedures to resolve disputes between a Bank Defendant … on the one side, and a cardholder on the other side.

(*Id.* at 4).  "Cardholder" under the Ross Settlement Agreement is defined as

"any Person … who holds a Credit Card issued by a Bank Defendant" (*id.* at 5),

and "Credit Card" is defined as:

> [A] general purpose payment card that extends to Cardholders a revolving line of credit or that requires payment of an amount due by a due date.  For avoidance of doubt, solely for purposes of use herein, Credit Card includes, without limitation, cards commonly known as credit cards and charge cards, but does not include debit cards, ATM cards, stored value cards, gift cards, or non-general purpose store cards.

(*Id.* at 6).  The agreement further specifies that it is governed by New York law

(*id.* at 35), and that the court will "retain personal and subject matter

jurisdiction over the implementation and enforcement" of the Ross Settlement

Agreement (*id.* at 38).  Of particular importance, the Ross Settlement

Agreement, by its terms, neither implicates the Deposit Account Agreement nor

imposes any restrictions on JPMCB.  (*See* Previn Decl., Exh. A).

## E.    The Instant Litigation

Plaintiff filed her complaint on January 29, 2013.  (Dkt. #1).  On

February 25, 2013, Plaintiff moved for the appointment of Bursor & Fisher,

P.A., as interim class counsel.  (Dkt. #8).  While Plaintiff's motion for

appointment of interim class counsel was pending, she filed a First Amended Class Action Complaint, the operative complaint, on March 7, 2013 (the "Complaint"). (Dkt. #14). The Honorable Paul G. Gardephe, the District Judge to whom the matter was then assigned, granted Plaintiff's motion for appointment of interim class counsel on May 30, 2013. (Dkt. #21).

On June 17, 2013, the case was transferred to the undersigned (Dkt. #22), and on July 30, 2013, a pre-motion conference was held to discuss Defendants' contemplated motion to stay the case in favor of arbitration. In accordance with the briefing schedule set at that conference, Defendants filed their Motion to Stay Proceedings in Favor of Arbitration on August 23, 2013. (Dkt. #30). Plaintiff filed her opposition on September 23, 2013 (Dkt. #35), and the motion was fully submitted on October 14, 2013, when Defendants filed their reply (Dkt. #38).

On January 15, 2014, the Court ordered the parties to submit supplemental letter briefs on whether the issue of arbitrability in this case should be determined by the Court or the arbitrator. (Dkt. #39). The parties submitted their supplemental letter briefs on January 22, 2014, as required. (Dkt. #40, 41).

## DISCUSSION

### A.    Applicable Law

The FAA "'creates a body of federal substantive law of arbitrability applicable to arbitration agreements affecting interstate commerce.'" *Ragone* v. *Atl. Video of Manhattan Ctr.*, 595 F.3d 115, 121 (2d Cir. 2010) (quoting *Alliance*

*Bernstein Inc. Research & Mgmt., Inc.* v. *Schaffran*, 445 F.3d 121, 125 (2d Cir.

2006)).  "[E]nacted in 1925, in response to widespread judicial hostility to

arbitration agreements," *AT&T Mobility LLC* v. *Concepcion*, 131 S. Ct. 1740,

1745 (2011), the FAA provides, in relevant part:

> A written provision in any maritime transaction or a contract
> evidencing a transaction involving commerce to settle by
> arbitration a controversy thereafter arising out of such contract or
> transaction ... shall be valid, irrevocable, and enforceable, save
> upon such grounds as exist at law or in equity for the revocation of
> any contract.

9 U.S.C. § 2.

The Supreme Court and the Second Circuit have consistently recognized

that the FAA embodies a "liberal federal policy favoring arbitration

agreements."  *CompuCredit Corp.* v. *Greenwood*, 132 S. Ct. 665, 669 (2012); *see

also AT&T Mobility LLC*, 131 S. Ct. at 1749 ("[O]ur cases place it beyond

dispute that the FAA was designed to promote arbitration"; noting that the Act

"embod[ies] a national policy favoring arbitration, and a liberal federal policy

favoring arbitration agreements, notwithstanding any state substantive or

procedural policies to the contrary" (internal citations and quotation marks

omitted)); *Sutherland* v. *Ernst & Young LLP*, 726 F.3d 290, 295 (2d Cir. 2013)

("In analyzing this provision of the FAA, the Supreme Court has remarked on

several occasions that it establishes a liberal federal policy favoring

arbitration." (internal quotation marks omitted)).  Central to this policy is the

tenet that "any doubts concerning the scope of arbitrable issues should be

resolved in favor of arbitration."  *Guyden* v. *Aetna, Inc.*, 544 F.3d 376, 382 (2d

Cir. 2008).  This tenet remains true "even when the claims at issue are federal

statutory claims, unless the FAA's mandate has been 'overridden by a contrary congressional command.'" *CompuCredit Corp.*, 132 S. Ct. at 669 (quoting *Shearson/Am. Express Inc.* v. *McMahon*, 482 U.S. 220, 226 (1987)).

It is well settled that "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Howsam* v. *Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002). In this regard, "[t]he FAA's primary purpose is to ensure that private agreements to arbitrate are enforced according to their terms." *In re Am. Exp. Fin. Advisors Sec. Litig.*, 672 F.3d 113, 127 (2d Cir. 2011) (internal quotation marks omitted). "The question whether the parties have submitted a particular dispute to arbitration, i.e., the '*question of arbitrability*,' is 'an issue for judicial determination unless the parties clearly and unmistakably provide otherwise.'" *Schneider* v. *Kingdom of Thailand*, 688 F.3d 68, 71 (2d Cir. 2012) (quoting *Howsam*, 537 U.S. at 83 (emphasis in original)). To that end, Section 3 of the FAA allows a United States district court to stay "the trial of the action until such arbitration has been had in accordance with the terms of the [parties'] agreement." 9 U.S.C. § 3; *see also Moses H. Cone Mem'l Hosp.* v. *Mercury Constr. Corp.*, 460 U.S. 1, 22, (1983) ("The [FAA] provides two parallel devices for enforcing an arbitration agreement: a stay of litigation in any case raising a dispute referable to arbitration, 9 U.S.C. § 3, and an affirmative order to engage in arbitration, § 4."); *Genesco, Inc.* v. *T. Kakiuchi & Co., Ltd.*, 815 F.2d 840, 844 (2d Cir. 1987) ("The [FAA] also provides in § 3 for a stay of proceedings where

the court is satisfied that the issue before it is arbitrable under the agreement.").

In ruling on a motion to stay judicial proceedings, "the court applies a standard similar to that applicable for a motion for summary judgment." *Bensadoun* v. *Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003) ("[T]he summary judgment standard is appropriate in cases where the District Court is required to determine arbitrability, regardless of whether the relief sought is an order to compel arbitration or to prevent arbitration."); *Builders Grp. LLC* v. *Qwest Commc'n Corp.*, No. 07 Civ. 5464 (DAB), 2009 WL 3170101, at *3 (S.D.N.Y. Sept. 30, 2009) ("The summary judgment standard is appropriate in cases where the District Court is required to determine arbitrability regardless of how the party that favors arbitration styles its motion."); *Ayco Co., L.P.* v. *Frisch*, No. 11-cv-580 (LEK/DRH), 2012 WL 42134, at *3 (N.D.N.Y. Jan. 9, 2012) ("[The summary judgment] standard applies to motions to stay judicial proceedings pending arbitration under § 3 of the FAA.").

"In this Circuit, courts follow a two-part test to determine the arbitrability of claims … a court must consider (1) whether the parties have entered into a valid agreement to arbitrate, and, if so, (2) whether the dispute at issue comes within the scope of the arbitration agreement." *In re Am. Exp. Fin. Sec. Litig.*, 672 F.3d at 128. "Before addressing the second inquiry, [the Court] must also determine who — the court or the arbitrator — properly decides the issue." *Id.* "The party seeking to stay the case in favor of arbitration bears an initial burden of demonstrating that an agreement to

arbitrate was made." *Hines* v. *Overstock.com, Inc.*, 380 F. App'x 22, 24 (2d Cir. 2010) (summary order).  Conversely, "[a] party to an arbitration agreement seeking to avoid arbitration generally bears the burden of showing the agreement to be inapplicable or invalid." *Harrington* v. *Atl. Sounding Co., Inc.*, 602 F.3d 113, 124 (2d Cir. 2010).

**B.    Analysis**

### 1.    The Ross Settlement Agreement Does Not Preclude Arbitration

The Court must first resolve the threshold issue of whether the Ross Settlement Agreement precludes JPMC and CBUSA from arbitrating Plaintiff's claim here.[6]  Indeed, as discussed *infra*, Plaintiff's opposition to Defendants' motion clarifies that this is the only disputed issue before the Court.  Plaintiff, as a putative member of the *Ross* settlement class, contends that the Ross Settlement Agreement prohibits JPMC and CBUSA from enforcing any arbitration clause based on CBUSA's Cardholder Agreement.  (Pl. Opp. 3).[7]  In contrast, Defendants argue that the Ross Settlement Agreement does not apply

---

[6]      Both parties agree that the Court should decide whether the Ross Settlement Agreement precludes JPMC and CBUSA from arbitrating Plaintiff's claims.  (*See* Dkt. #40, 41).  Accordingly, this threshold issue, whether construed as one of arbitrability or something else, is for the Court to decide.  *See Granite Rock Co.* v. *Int'l Brotherhood of Teamsters et al.*, 130 S. Ct. 2847, 2857 (2010) (recognizing that "[t]he parties agree[d] that it was proper for the District Court to decide whether their ratification dispute was arbitrable," and concluding that "[b]ecause neither party argue[d] that the arbitrator should decide this question, there [was] no need to apply the rule requiring clear and unmistakable evidence of an agreement to arbitrate arbitrability" (internal quotation marks omitted)); *cf. In re Am. Exp. Fin. Advisors Sec. Litig.*, 672 F.3d at 134 ("[T]his Court has said that where 'there is ample evidence that the District Court intended to place its judicial imprimatur on a settlement,' the court retains jurisdiction to oversee the enforcement of the agreement." (quoting *Perez* v. *Westchester Cnty. Dep't of Corr.*, 587 F.3d 143, 152 (2d Cir. 2009)).

[7]      Plaintiff does not dispute her obligation to arbitrate this dispute with JPMCB.

14

to any of the claims set out in the First Amended Complaint, and is "irrelevant in this case." (Def. Br. 18).

Plaintiff advances two principal arguments concerning the preclusive effect of the Ross Settlement Agreement. To start, Plaintiff argues that "because this case involves unauthorized ODP Transfer Charges and Overdraft Interest Charges on [Plaintiff's Credit Card Account], JPMC and CBUSA are estopped from enforcing an arbitration clause against Plaintiff[] based on CBUSA's Card[holder] Agreement." (Pl. Opp. 5 (internal quotation marks omitted)). Plaintiff's argument, however, is based on the flawed premise that Defendants seek to enforce the arbitration clause in CBUSA's Cardholder Agreement. They do not. Instead, Defendants have consistently and exclusively invoked the Arbitration Agreement in the Deposit Account Agreement to stay litigation in this case.

Moreover, there is nothing in the record that suggests that by doing so, JPMC or CBUSA sought to thwart their obligations under the Ross Settlement Agreement. To be sure, one need only look to the very claims that Plaintiff advances against Defendants. Each is predicated on, and would not exist without, the Overdraft Protection Program — a service provided only under the Deposit Account Agreement containing the Arbitration Agreement on which Defendants rely. Plaintiff cannot recast her claims as falling within the purview of the Ross Settlement Agreement in order to avoid her obligation to arbitrate this dispute with Defendants.

What is more, examination of Plaintiff's claims makes evident that one need not even have a Cardholder Agreement in order to be a member of Plaintiff's anticipated class.  This is because customers enrolled in the Overdraft Protection Program may choose as a funding account a savings account, a credit card account, or another qualifying line of credit.  (Goforth Decl., Exh. B at 12).  Those potential plaintiffs who, unlike Plaintiff, used a savings account or qualifying line of credit for their funding account need not have entered into the Cardholder Agreement that is the subject of the Ross Settlement Agreement in order to prosecute the claims pending before the Court.  Indeed, even according to Plaintiff, it is only by happenstance that the Cardholder Agreement is relevant to her particular claim, because as she alleges, Defendants enrolled her in the Overdraft Protection Program and linked her Credit Card Account as the funding account without her authorization. (FAC ¶ 54).

Plaintiff acknowledges that the class can include persons without a Cardholder Agreement when she alleges, with respect to her breach of contract claim, that "Plaintiff and Class and Subclass members entered into a legally binding contract with JPMCB when they opened their checking accounts, governed by the Deposit Account Agreement, and their funding accounts, governed by the funding account agreements (in Plaintiff's case, her Card[holder] Agreement)."  (FAC ¶ 97).  In short, Plaintiff's claims could be maintained whether or not she had a Cardholder Agreement, so long as she was enrolled in the Overdraft Protection Program and, as a result, had one

16

funding account with Defendants.  Thus, Plaintiff's contention that her "allegations concerning the Card[holder] Agreement stand on their own" (Pl. Opp. 7), is refuted by the record before the Court.

Plaintiff's next argument is that the Ross Settlement Agreement extends to the Deposit Account Agreement through its broad definition of "Arbitration Clause," which includes "the terms and conditions contained *in any document* purportedly binding cardholders — including but not limited to correspondence, change-in-terms notices, cardholder agreements, initial disclosures, solicitations or billing statements." (Pl. Opp. 8 (emphasis in original)).  Reasoning from the specification "in any document," Plaintiff extrapolates that the prohibition of enforcing arbitration clauses agreed to by the parties to the Ross Settlement Agreement extends to agreements other than the Cardholder Agreement (here, the Deposit Account Agreement).  (*Id.*). Plaintiff buttresses this argument by pointing to language in the Ross Settlement Agreement that prohibits JPMC and CBUSA from enforcing "an Arbitration Clause or Class Action Waiver Clause against a member of the Settlement Class *based on* currently existing or pre-existing United States Cardholder Agreements." (*Id.* at 5 (emphasis added)).  Plaintiff argues that "based on," takes its plain language meaning of "bear upon, built on, contingent upon, dependent on, founded on, grounded on, relying on, rested on," and, further, that by using this expansive term, the Ross Settlement Agreement extends to actions, like the one before this Court, that "bear upon" the Cardholder Agreement.  (*Id.*).

17

The Ross Settlement Agreement does not have such an expansive reach. "'Settlement agreements are contracts and must therefore be construed according to general principles of contract law.'" *Collins* v. *Harrison-Bode*, 303 F.3d 429, 433 (2d Cir. 2002) (quoting *Red Ball Interior Demolition Corp.* v. *Palmadessa*, 173 F.3d 481, 484 (2d Cir. 1999)). "It is axiomatic under New York law … that the fundamental objective of contract interpretation is to give effect to the expressed intentions of the parties." *Lockheed Martin Corp.* v. *Retail Holdings, N.V.*, 639 F.3d 63, 69 (2d Cir. 2011) (internal quotation marks omitted).[8]   It is well established that the parties' intentions are generally discerned from the four corners of the document itself.   *MHR Capital Partners LP* v. *Pressteck, Inc.*, 12 N.Y.3d 640, 645 (2009).   To that end, "a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms."   *Id.*   It is equally "well settled that a contract is unambiguous if the language it uses has a definite and precise meaning, as to which there is no reasonable basis for a difference of opinion."   *Lockheed Martin Corp.*, 639 F.3d at 69 (internal quotation marks omitted).

The Ross Settlement Agreement unambiguously applies solely to the Cardholder Agreement.   The language referring to "any document" is immediately restricted by the following clause "purportedly binding cardholders."   The Ross Settlement Agreement defines cardholders as "any

---

[8]   The Ross Settlement Agreement provides that New York law applies, and the parties have not argued otherwise.   Accordingly, the Court will apply New York law.   *Collins*, 303 F.3d at 433 n.1 ("The Settlement Agreement specifically provides that New York law applies, and the parties have not argued otherwise.   Accordingly, we see no reason for us not to apply the law of New York." (internal quotation marks omitted)).

Person … who holds a Credit Card issued by a Bank Defendant," with "Credit Card" meaning "a general purpose payment card that extends to Cardholders a revolving line of credit or that requires payment of an amount due by a due date," but which does not include "debit cards, ATM cards, stored value cards, gift cards, or non-general purpose store cards."  (Previn Decl., Exh. A at 5-6). In accordance with these clear definitions, the Deposit Account Agreement cannot bind a cardholder, and thus cannot be included among the "documents" governed by the definition of "Arbitration Clause" in the Ross Settlement Agreement.  Moreover, a review of the Ross Settlement Agreement demonstrates that it applies only to the Cardholder Agreement.  Plaintiff's proffered interpretation of "based on" neither renders the agreement ambiguous, *Mount Vernon Fire Ins. Co.* v. *Creative Hous. Ltd.*, 88 N.Y.2d 347, 352 (1996) ("[P]rovisions in a contract are not ambiguous merely because the parties interpret them differently."), nor proves that it should be applied as expansively as Plaintiff advocates.  Indeed, to impose such a malleable interpretation would contravene the parties' intent, as there is nothing in the Ross Settlement Agreement, or otherwise before the Court, that suggests that the parties envisioned it would apply to preclude JPMC and CBUSA from enforcing an arbitration clause in a separate agreement for an unrelated account.[9]

---

[9]     As Defendants point out, the Final Judgment and Order of Dismissal approving the Ross Settlement Agreement indicates that the parties agreed to bar JPMC and CBUSA from "seeking to enforce the Arbitration Clause or Class Action Waiver Clause *in* any of the Settling Defendants' existing or pre-existing United States Cardholder Agreements." (Marchese Decl., Exh. A ¶ 7 (emphasis added)).  Use of "in" is yet further indication that the Ross Settlement Agreement is limited to instances where JPMC or CBUSA seek to

If the textual analysis were not enough, the Court finds additional support for its conclusion that the Ross Settlement Agreement does not foreclose arbitration here in *Chavez* v. *Bank of America*, where the district court rejected virtually the identical argument that Plaintiff now advances. No. C 10-653 JCS, 2011 WL 4712204, at *5 (N.D. Cal. Oct. 7, 2011). In *Chavez*, plaintiffs had filed a class action claiming that they had been enrolled in and charged for an identity theft protection program, namely Privacy Assist, without their consent. *Id.* at *1. One of the defendants moved to stay the litigation pursuant to an agreement between the plaintiffs, on the one hand, and Bank of America, N.A. ("BANA") and FIA Card Services, N.A. ("FIA"), on the other hand, that contained an arbitration agreement as to which the moving defendant claimed to be a third-party beneficiary. *Id.* In opposing the defendant's motion to stay, the plaintiffs argued that the arbitration agreement was unenforceable under a separate settlement agreement entered into between the plaintiffs, BANA, and FIA in *Ross*. *Id.* Like here, under the settlement agreement at issue in *Chavez*, the parties agreed not to enforce the arbitration provisions contained in cardholder agreements with their customers. *Id.* at *5. The court rejected the plaintiff's argument stating:

> Plaintiffs point to no specific provision in the settlement agreement that would extend to the present situation — a separate agreement between customers and BANA, FIA for a service. The *Ross* settlement agreement specifically refers to preexisting or then existing "Cardholder Agreements." Plaintiffs fail to explain how a separate contract for additional services — Privacy Assist — can be

---

enforce an arbitration clause *in* the Cardholder Agreement, which is of course not what Defendants seek to do here.

construed under this contract to constitute a "Cardholder Agreement."

*Id.* Based on this, the court held that the defendant was "not precluded from pursuing arbitration on the basis of the *Ross* settlement agreement between BANA, FIA and its cardholders." *Id.*

The *Chavez* court's assessment is immediately applicable here, and Plaintiff's attempt to distinguish that decision is unconvincing. Accordingly, the Ross Settlement Agreement does not preclude JPMC and CBUSA from enforcing the Arbitration Agreement in the Deposit Account Agreement.

### 2. Plaintiff Agreed to Arbitrate Her Claims Against All Defendants

Having decided that the Ross Settlement Agreement does not preclude JPMC and CBUSA from arbitrating this dispute with Plaintiff, the Court next turns to whether the parties should proceed to arbitration on Plaintiff's claim. This issue has been resolved, albeit implicitly, by Plaintiff's position before the Court. That is, Defendants contend that (i) Plaintiff agreed to arbitrate this dispute with all Defendants pursuant to the Arbitration Agreement contained in the Deposit Account Agreement, and (ii) the parties' dispute falls squarely within the Arbitration Agreement. (Def. Br. 8). For strategic or other reasons unknown to the Court, Plaintiff has failed to respond to these arguments, focusing instead only on the purported effect of the Ross Settlement Agreement on the parties' dispute. (*See* Pl. Opp. 3-11). In doing so, Plaintiff effectively concedes the validity of the Arbitration Agreement and its conclusive effect of requiring Plaintiff to arbitrate this dispute with all Defendants. *Felske* v. *Hirchmann*, No. 10 Civ. 8899 (RMB), 2012 WL 716632, at *3 (S.D.N.Y. Mar. 1,

2012) ("A Plaintiff effectively concedes a defendant's arguments by his failure to respond to them."); *see Abrahams* v. *Young & Rubicam Inc.*, 79 F.3d 234, 237 n.2 (2d Cir. 1996) (deeming plaintiff's claims waived where plaintiff failed to address the proprietary of the district court's dismissal of certain claims); *Rosenblatt* v. *City of New York*, No. 05 Civ. 5521 (GEL), 2007 WL 2197835, at *7 (S.D.N.Y. July 31, 2007) ("Plaintiff effectively concedes defendants' other arguments … by her failure to respond to them."); *see also Burton* v. *Niagara Frontier Transp. Auth.*, No. 11-cv-00971 (RJA), 2013 WL 3423754, at *6 (W.D.N.Y. July 8, 2013) ("Plaintiff does not address the dismissal of these claims, and effectively concedes [] defendant's arguments by his failure to respond to them." (internal quotation marks omitted)); *Miles* v. *Walawender*, No. 10-CV-00973 (JJM), 2013 WL 1908304, at *1 (W.D.N.Y. May 7, 2013) ("Plaintiff's opposing Memorandum of Law does not respond to this argument, and effectively concedes these arguments by his failure to respond to them."); *Johnston* v. *Town of Orangetown*, No. 10 Civ. 8763 (GAY), 2013 WL 1189483, at *7 n.3 (S.D.N.Y. Mar. 22, 2013) ("Defendants moved for summary judgment on said claims. … Plaintiff failed to respond to defendants' arguments and, thus, apparently concedes defendants' points and waives said claims.").  In short, Plaintiff's failure to respond to Defendants' arguments evidences her admission that if the Ross Settlement Agreement does not preclude JPMC and CBUSA from enforcing the Arbitration Agreement, as this Court just held, this case should proceed to arbitration.

### 3.     Plaintiff's Complaint Should Be Dismissed

Section 3 of the FAA provides that where the claims pending before a court are "referable to arbitration," the court "shall … stay the trial of the action" until the parties arbitrate the dispute.  9 U.S.C. § 3.  Courts are vested with equal discretion to dismiss rather than stay a case when, as here, all the claims before the court must be arbitrated.  *Arrigo* v. *Blue Fish Commodities, Inc.*, 704 F. Supp. 2d 299, 305 (S.D.N.Y. 2010) ("[W]here all of the issues raised in the Complaint must be submitted to arbitration, the Court may dismiss an action rather than stay proceedings."); *see also Salim Oleochemicals* v. *M/V Shropshire*, 278 F.3d 90, 92-93 (2d Cir. 2002).[10]  Although the trend in this District is to stay, rather than dismiss an action, Plaintiff has requested dismissal for any of Plaintiff's claims that the Court determines should be arbitrated.  (Pl. Opp. 11).  Plaintiff asserts that the "the proper procedural course is to dismiss those claims against the defendant(s) who successfully argue in favor of arbitration, and allow the case against the remaining defendants to proceed in this Court."  (*Id.*; *see* Scott Decl. ¶ 2).  Because Plaintiff must arbitrate all of her claims against all Defendants, no claims remain before the Court, and all of Plaintiff's claims may be dismissed.[11]

---

[10]     In this regard, the Second Circuit has recognized that whether a matter is stayed or dismissed may impact the speed with which the matter may be arbitrated.  Specifically, if a matter is dismissed, it is reviewable by an appellate court under § 16(a)(3) of the FAA.  9 U.S.C. § 16(a)(3); *Salim Oleochemicals*, 278 F.3d at 93 ("[A] dismissal renders an order appealable under § 16(a)(3).").  In contrast, "the granting of stay is an unappealable interlocutory order under § 16(b)."  *Id.*; *see also* 9 U.S.C. § 16(b).

[11]     To be clear, the Court was initially inclined to stay the proceedings, in light of the Circuit's expressed concern that an order of dismissal that was subject to appeal might needlessly delay the arbitration proceedings.  It is only because Plaintiff indicated her preference for dismissal of the claim, rather than arbitration, that the Court is

**CONCLUSION**

For the foregoing reasons, Defendants' Motion to Stay This Litigation in Favor of Arbitration, as modified by the parties' request for dismissal, is GRANTED.

The Clerk of Court is directed to terminate Docket Entry 30, and to close the case.

SO ORDERED.

Dated:      January 30, 2014
            New York, New York

_____
            KATHERINE POLK FAILLA
            United States District Judge

---

dismissing the case.  In so doing, the Court does not intend to facilitate Plaintiff's path to an appeal from the instant decision, which would engender the very delay as to which the Circuit has expressed concern.